Richard A. Kissel (RK 0072)
Charles Hyman (CH 8676)
Kissel & Pesce LLP
550 White Plains Road
Tarrytown, New York 10591
(914) 750-5933
(914) 750-5922 (fax)
Attorneys for SR International Business Insurance Co.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**SR INTERNATIONAL BUSINESS**
**INSURANCE COMPANY,**

                Plaintiff,

      vs.

**MCI, INC., BERNARD EBBERS, SCOTT D.**
**SULLIVAN, BETTY L. VINSON, TROY M.**
**NORMAND, BUFORD YATES JR., SUSAN**
**G. BELL, CLIFFORD ALEXANDER JR.,**
**JAMES C. ALLEN, JUDITH AREEN,**
**CARL J. AYCOCK, RONALD R.**
**BEAUMONT, FRANCESCO GALESI,**
**STILES A. KELLETT JR., GORDON S.**
**MACKLIN, DAVID F. MYERS, JOHN A.**
**PORTER, BERT C. ROBERTS JR.,**
**ESTATE OF JOHN W. SIDGMORE,**
**LAWRENCE A. TUCKER, JUAN**
**VILLALONGA, MAX E. BOBBIT, AND**
**JOHN DOES 1-50.**

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

04 Civ. 04567 (DLC)

ECF CASE

**OPPOSITION TO**
**DEFENDANT ROBERTS'**
**MOTION TO DISMISS**
**PURSUANT TO FRCP 12(h)(3)**

<u>**OPPOSITION TO DEFENDANT BERT C. ROBERTS'**</u>
<u>**MOTION TO DISMISS FOR LACKOF SUBJECT MATTER**</u>
<u>**JURISDICTION PURSUANT TO FRCP 12(h)(3)**</u>

Plaintiff SR International Business Insurance Company ("SRI") respectfully

submits this opposition to the motion of Defendant Bert C. Roberts ("Roberts") to

dismiss SRI's complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(h)(3). Roberts' motion is should be dismissed as moot or denied in light of SRI's amended complaint, which was filed on July 21, 2004.

1.      In his motion, Roberts asserts that the SRI complaint should be dismissed because it is alleged therein that "defendant Juan Villalonga ("Villalonga") resides in Spain..." (SRI Complaint ¶ 21), and that subject matter jurisdiction is premised on 28 U.S.C. § 1332(a)(2).

2.      Because a motion to dismiss is not a "responsive pleading" pursuant to Fed. R. Civ. P. 15(a), *see, e.g., Washington v. James*, 782 F.2d 1134 (2d Cir. 1986), SRI is permitted to amend its complaint once as a matter of course.

3.      On July 21, 2004, SRI filed its First Amended Complaint and Jury Demand, which does not include Juan Villalonga as a party defendant. A copy of the First Amended Complaint is annexed hereto as Exhibit A.

4.      WHEREFORE, Roberts's motion to dismiss pursuant to Fed. R. Civ. Pro. 12(h)(3) should be denied, or dismissed as moot.

Dated: Tarrytown, New York
      July 21, 2004               Respectfully submitted,


                           /s/ Charles Hyman
                        Richard A. Kissel (RK-0072)
                        Charles Hyman (CH-8676)
                        Kissel & Pesce LLP
                        555 White Plains Road
                        5th Floor
                        Tarrytown, New York 10591
                        (914) 750-5933 (phone)
                        (914) 750-5922 (fax)
                        Attorneys for SR International
                        Business Insurance Company

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**SR INTERNATIONAL BUSINESS
INSURANCE COMPANY,**

                Plaintiff,

vs.

**MCI, INC., BERNARD EBBERS, SCOTT D.
SULLIVAN, BETTY L. VINSON, TROY M.
NORMAND, BUFORD YATES JR., SUSAN
G. BELL, CLIFFORD ALEXANDER JR.,
JAMES C. ALLEN, JUDITH AREEN,
CARL J. AYCOCK, RONALD R.
BEAUMONT, FRANCESCO GALESI,
STILES A. KELLETT JR., GORDON S.
MACKLIN, DAVID F. MYERS, JOHN A.
PORTER, BERT C. ROBERTS JR.,
ESTATE OF JOHN W. SIDGMORE,
LAWRENCE A. TUCKER AND MAX E.
BOBBIT,**

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

04 Civ. 04567 (DLC)

ECF CASE

**FIRST AMENDED
COMPLAINT AND
JURY DEMAND**

        Plaintiff, SR International Business Insurance Company ("SRI"), by and through its attorneys, Kissel & Pesce, LLP, as its complaint against Defendants, alleges as follows:

        1.   This is an action for declaratory, equitable and other relief.  SRI seeks a declaration that defendants, and/or their subsidiaries, predecessors, successors or assigns, have no rights under the Excess Director and Officer and Corporate Liability Insurance Policy, number MP29075.1 ("SRI Policy"), issued to WorldCom, Inc. ("WorldCom"), as more fully described below, and that the SRI Policy is void *ab initio* and therefore rescinded as to all defendants.

## VENUE AND JURISDICTION

2.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 (a)(2) as it involves a controversy that exists between citizens of various states and a foreign corporation, with the amount in controversy exceeding $75,000.

3.   Under 28 U.S.C. §2201(a), this court may declare the rights of the parties.

4.   This Court has personal jurisdiction over the defendants because the action arises from the transaction by the defendants, directly or through agents, of business in New York.

5.   Venue is proper in this district pursuant to 28 U.S.C. § 1391, because a substantial portion of the events and omissions giving rise to the claim occurred in the Southern District of New York.

## THE PARTIES

6.   Plaintiff SRI is a corporation organized under the laws of Switzerland with its principal place of business in Zurich, Switzerland.  SRI is in the business of underwriting insurance of various types, including, *inter alia*, insurance policies commonly known as Director and Officer's liability ("D&O") policies.

7.   Upon information and belief, defendant Bernard Ebbers ("Ebbers") is a citizen of the state of Mississippi and was, at all relevant times, a Director and President and Chief Executive Officer of WorldCom.

8.   Upon information and belief, defendant Scott D. Sullivan ("Sullivan") is a citizen of the state of Florida and, from 1996 until he was fired from the Board of Directors on June 25, 2002, was a Director and Chief Financial Officer of WorldCom.

2

9.  Upon information and belief, defendant Betty L. Vinson ("Vinson") is a citizen of Mississippi and was, at all relevant times, Director of Management Reporting of WorldCom.

10. Upon information and belief, defendant Troy M. Normand ("Normand") is a citizen of Mississippi and was, at all relevant times, Director of Legal Entity Reporting of WorldCom.

11. Upon information and belief, defendant John W. Sidgmore ("Sidgmore") was a citizen of the state of Maryland and was, at all relevant times, a Director of WorldCom.  Sidgmore was also Chief Operating Officer of WorldCom in 1999.  Mr. Sidgmore has since deceased, and the Estate of John W. Sidgmore is named in his stead.

12. Upon information and belief, defendant Bert C. Roberts ("Roberts") is a citizen of the state of Mississippi, or alternatively the state of Tennessee, and was, at all relevant times, a Director of WorldCom and Chairman of the Board of Directors from 1998 to 2002.

13. Upon information and belief, defendant Ronald Beaumont ("Beaumont") is a citizen of the state of Texas and was, at all relevant times, a Director of WorldCom and Chief Operating Officer of WorldCom Group.

14. Upon information and belief, defendant Max. E. Bobbit ("Bobbit") is a citizen of the state of Florida and was, at all relevant times, a Director, Chairman of the Audit Committee, and member of the Compensation and Stock Option Committee of WorldCom.

15. Upon information and belief, defendant Francesco Galesi ("Galesi") is a citizen of the state of New York, or alternatively the state of Mississippi, and was, at all relevant times, a Director and member of the Audit Committee of WorldCom.

16. Upon information and belief, defendant Judith Areen ("Areen") is a citizen of the District of Columbia, or alternatively the state of Maryland or Virginia, and was, at all relevant times, a Director and member of the Audit Committee of WorldCom.

17. Upon information and belief, defendant Carl J. Aycock ("Aycock") is a citizen of the state of Mississippi and was, at all relevant times, a Director of WorldCom.

18. Upon information and belief, defendant Stiles A. Kellet, Jr. ("Kellet") is a citizen of the state of Georgia and was, at all relevant times, a Director and Chairman of the Compensation and Stock Option Committee of WorldCom.

19. Upon information and belief, defendant David F. Myers ("Myers") is a citizen of the state of Mississippi. Myers joined WorldCom in 1995 and became Controller of WorldCom in 1997. Upon information and belief, Myers became a Senior Vice President of WorldCom in early 2000, and remained in this position until his resignation on June 25, 2002.

20. Upon information and belief, defendant Gordon S. Macklin ("Macklin") is a citizen of the state of Maryland and was, at all relevant times, a Director and member of the Compensation and Stock Option Committee of WorldCom.

21. Upon information and belief, defendant John A. Porter ("Porter") is a citizen of the state of Maryland, or alternatively the state of Florida, and was, at all relevant times, a Director and Vice-Chairman of the Board of Directors of WorldCom.

22. Upon information and belief, defendant Buford Yates, Jr. ("Yates") is a citizen of the state of Mississippi and, from 1997 through August 2002, served as the Director of General Accounting of WorldCom.

23. Upon information and belief, defendant James C. Allen ("Allen") is a citizen of the state of Florida, or alternatively the state of Missouri, and was, at all relevant times, a Director and member of the Audit Committee of WorldCom.

24. Upon information and belief, defendant Lawrence A. Tucker ("Tucker") is a citizen of the state of Connecticut and was, at all relevant times, a Director of WorldCom and was a member of the Compensation and Stock Option Committee until late 2000, and an honorary member of that Committee thereafter.

25. Upon information and belief, defendant Clifford Alexander, Jr. ("Alexander") is a citizen of the District of Columbia and was, at all relevant times, a Director of WorldCom.

26. Upon information and belief, defendant Susan G. Bell who, known at all relevant times hereto as Susan Mayer ("Mayer") is a citizen of Mississippi and was, at all relevant times, Senior Vice President of WorldCom.

27. WorldCom, currently named as a related non-party, is a corporation organized under the laws of the state of Georgia, with its principal place of business in Virginia, but was, at all relevant times, located in Mississippi.

28. Defendant MCI, Inc. ("MCI"), the reorganized WorldCom, and successor in interest, is a corporation organized under the laws of the state of Delaware, with its principal place of business in Virginia.

29. Willis Coroon Corporation of New York ("Willis"), named as a related non-party, is a corporation organized under the laws of the state of New York, with its principal place of business in New York, New York. Willis acted as agent for the defendants in the procurement of the SRI Policy.

## THE POLICIES

30. In general, and as limited by its terms, conditions and exclusions, a D&O policy is designed to reimburse the insured corporation when the corporation is obligated to indemnify its directors and officers for "losses" in connection with "claims" resulting from wrongful acts of their directors' and officers' done in their capacity as such.

31. The D&O policy may also directly cover a corporation's directors and officers for their legal liability arising out of their wrongful acts in connection with their duties as directors and officers. Moreover, a D&O policy may also provide "entity coverage," covering the corporation itself for its own liability arising out of alleged securities violations.

32. WorldCom negotiated and purchased D&O coverage from SRI in the last quarter of 2001, which coverage was intended to be in effect for the period December 31, 2001 to December 31, 2002, for the benefit of WorldCom, various subsidiaries and its directors and officers.

33. The Defendant directors and officers named herein knew that WorldCom would, and was in fact required to, procure D&O coverage for their benefit.

34. Excess policies were issued in "layers," so that if the limits of liability were to become exhausted on a lower layer policy, the excess policy directly "above" the "exhausted" policy would become applicable to covered claims.

35. National Union Fire Insurance Company of Pittsburgh, PA ("Nat Union") provided the first, or "primary," layer of D&O coverage to WorldCom ("Nat Union Policy). The Nat Union Policy, number 874-91-08, contains limits of liability of $15 million per occurrence, per director, and in the aggregate, subject to a self-insured retention ("SIR") of $5,000,000 in respect of Securities Claims first made during the policy period. A true and correct copy of the Nat Union Policy is attached hereto as Exhibit 1.

36. The SRI Policy was intended to provide coverage on the third layer (or second excess layer) and could, therefore, only become applicable after the limits of the first and second layers were exhausted by the payment of defense expenses, judgments, and/or settlements.

37. SRI sent a "binder" to Willis, WorldCom's insurance broker, on December 27, 2001, evidencing that, based on the information provided to it by WorldCom through Willis, SRI had agreed to provide D&O coverage to WorldCom for the period December 31, 2001 to December 31, 2002, with limits of liability of $15 million excess of $30 million in underlying coverage and the SIR (the "Binder"). A true and correct copy of the Binder is attached hereto as Exhibit 2.

38. The Binder stated that policy documents, evidencing the coverage described in the binder, would not be issued until, *inter alia*, SRI received a completed and signed application from WorldCom and a copy of the Nat Union Policy. See Exhibit 2.

39. On or about July 10, 2002, SRI sent the SRI Policy to Willis, which, among other things, provided that it was issued "*in reliance upon all statements made and information furnished* to the Company subscribing to this Policy, (hereinafter called the 'Insurer'), *including the statements made in the Proposal Form* [application] attached hereto and made a part hereof . . . ." (emphasis added).  A true and correct copy of the SRI Policy is attached hereto as Exhibit 3.

40. In the SRI Policy, an Insured is defined as "any person who qualifies as an Insured under the terms of the Underlying Policy . . . ."  <u>See</u> Exhibit 3.

41. Insofar as pertinent here, the Underlying Nat Union Policy defines "Insured" to mean:

> (1) with respect to Coverages A and B(ii), any past, present or future duly elected or appointed directors and officers of the Company.  In the event the Named Corporation or a Subsidiary thereof operates outside the United States, then the terms "Director(s) or Officer(s) or "Insured(s)" also mean those titles, positions or capacities in such foreign Named Corporation or Subsidiary which is equivalent to the position of Director(s) or Officer(s) in a corporation incorporated within the United States.  Coverage will automatically apply to all new Directors and Officers after the inception date of this policy;
>
> (2) with respect to Coverage B(i) only, the Company.

<u>See</u> Exhibit 1.

42. The SRI Policy "follows form" to the Nat Union Policy.  That is, as set forth in Section I A. of the SRI Policy, which is entitled "Incorporation of Policy to be Followed":

> Except as regards to the premium, the Limit of Liability, the Policy Period, and except as otherwise provided herein, this Policy is subject to the same insuring clauses, warranties, definitions, terms, conditions, exclusions and other provisions as those contained in

the Underlying Policy to be followed identified in Item 5. of the
Declarations, at its inception.

<u>See</u> Exhibit 3.

## **THE APPLICATION PROCESS**

43. On November 20, 2001, Willis sent SRI a package of documents, including an unsigned, but otherwise essentially completed, "renewal" application form for the Nat Union Policy ("Unsigned Renewal Application"). A true and correct copy of the Unsigned Renewal Application sent to SRI by Willis is attached hereto as Exhibit 4.

44. Item "14" of the Unsigned Renewal Application required WorldCom to "provide copies of": (a) its most recent annual report; (b) the latest 10K report filed with the SEC; (c) the most recent interim financial statement; (d) proxy statements and notices of annual shareholder meetings for the preceding six months, (e) all registration statements filed with the SEC within the last twelve months; (f) copies of indemnification agreements; and (g) the latest CPA management letter and responses. The application provided that the requisite documents could either be physically attached or, "[i]f such information is available on the Organization's website . . ." by incorporating the documents by reference to that website. WorldCom chose this latter option. <u>See</u> Exhibit 4.

45. Specifically, WorldCom answered application questions 14(a) through 14(e), and a portion of question 14(f), by referring the insurer to its website. <u>See</u> Exhibit 4.

46. On December 12, 2001, Willis advised SRI by e-mail that negotiations for the Nat Union Policy had been successful and asked SRI to "offer a $15MM xs [excess

of] $15MM layer." A true and correct copy of a printout of the December 12, 2001 e-mail is attached hereto as Exhibit 5.

47. On December 14, 2001, SRI provided the requested quotation; $1,200,000 in premium for a policy with limits of $15 million excess of $15 million. SRI, however, informed Willis that this quote could not be considered a *bona fide* proposal unless and until SRI received an executed copy of the Nat Union application, a copy of the Nat Union Quote Terms and Conditions, and a copy of the Nat Union Policy, to which the excess policies would follow form. A true and correct copy of the SRI December 14, 2001 quotation is attached hereto as Exhibit 6.

48. In addition, SRI reserved the right to withdraw the quote if WorldCom's condition materially changed or if events occurring subsequent to the application but before the effective date of the policy could affect SRI's underwriting evaluation. Specifically, the Quote advised:

> If between the date of this quotation and the effective date of the policy, there is a material change in the condition of WorldCom Corporation or an occurrence of an event which could change the underwriting evaluation of WorldCom Corporation, then at the company's [SRI's] discretion, this quotation may be withdrawn by written notice thereof to WorldCom Corporation.

See Exhibit 6.

49. On December 17, 2001, Willis also asked SRI to provide a quote for the $15 million excess of $30 million layer of D&O coverage. A true and correct copy of a printout of the e-mailed request for a quote for the $15 million excess of $30 million layer is attached hereto as Exhibit 7.

50. The next day, SRI provided the requested quotation, with a premium of $975,000, for the higher layer of coverage. A true and correct copy of the SRI $15 million excess of $30 million proposal is attached hereto as Exhibit 8.

51. As with the earlier quotation for the lower layer of coverage, SRI reserved the right to withdraw the quotation in the event of certain circumstances, described above in paragraph 50, were to occur. See Exhibit 6.

52. Willis confirmed by e-mail to SRI on December 21, 2001 that SRI would accept, for its underwriting purposes, the Unsigned Renewal Application, with the addition of an original signature. This, the communication stated, would complete the underwriting process. A true and correct copy of a printout of the December 21, 2001 e-mail is attached hereto as Exhibit 9.

53. On December 27, 2001, SRI issued the Binder for D&O coverage with limits of $15 million excess $30 million for a premium of $975,000. The Binder provided that the "issuance of the policy [would be] subject to [SRI's receipt of a] copy of the final primary policy and underlying policies." See Exhibit 2.

54. SRI received a signed copy of the Renewal Application Form for the Nat Union Policy ("Signed Renewal Application"), which had been executed by WorldCom's president, Bernard Ebbers, on January 23, 2002. A true and correct copy of the Signed Renewal Application is attached hereto as Exhibit 10. In the Signed Renewal Application, WorldCom's Rye Brook, New York address was crossed out and a Washington D.C. address inserted in its stead.

55. The application form signed by Mr. Ebbers included the following notices:

**NOTICE TO DISTRICT OF COLUMBIA APPLICANTS:**
"WARNING: IT IS A CRIME TO PROVIDE FALSE OR

MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALITES INCLUDE IMPRISONMENT, PENALTIES OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT."

\*    \*    \*

**NOTICE TO NEW YORK APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AND APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED $5,000 AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION."

See Exhibit 4.

## WORLDCOM'S MISREPRESENTATIONS AND FRAUDULENT ACTIVITY

### *BACKGROUND*

56. Not long after the insurance coverage fraudulently procured by WorldCom was bound, WorldCom was in disarray, and was forced to declare bankruptcy as a result of its misdeeds. Soon after that, WorldCom's officers were admitting their guilt to criminal charges arising from their fraudulent manipulations of the company's books.

57. On June 25, 2002, WorldCom revealed that it had improperly classified approximately $3.9 billion in "line cost" expenses as "capital expenditures." As a result of that impropriety, WorldCom was forced to acknowledge that it had significantly

overstated its earnings for all four quarters of 2001 and the first quarter of 2002, and

that the corrected figures would show a net loss for 2001 and the first quarter of 2002.

This was in sharp contrast to the purported profit reported by WorldCom in its original

financial statements, which were incorporated by reference in the policy application.

See Report of Investigation by Special Investigative Committee of the Board of

Directors of WorldCom, Inc. ("Special Investigative Committee Report"), at 2, 9-18, of

which a true and correct copy is attached hereto as Exhibit 11.

58. Following this announcement, the value of WorldCom shares quickly

dropped to about $.05 on the NASDAQ exchange, WorldCom was delisted from the

exchange, and an avalanche of class action lawsuits were filed against WorldCom and

its directors and officers.

59. A corporate monitor, Richard Breeden ("Breeden"), was appointed to guard

against the shredding of documents or looting of company assets.

60. On July 8, 2002, WorldCom General Counsel Michael Salsbury

("Salsbury") submitted WorldCom's revised statement pursuant to Section 21(a)(1) of

the Securities and Exchange Act of 1934 (the "Section 21(a)(1) Statement") to the

Securities and Exchange Commission ("SEC"). A true and correct copy of the Section

21(a)(1) Statement is attached hereto as Exhibit 12.

61. The Section 21(a)(1) Statement acknowledged that defendant Sullivan,

WorldCom's Chief Financial Officer, and defendant Myers, WorldCom's Controller

(the very individuals responsible for the preparation of WorldCom's financial

statements) were responsible for the improper accounting transactions that had led to

the necessity for a restatement. See Exhibit 12.

62. Upon discovery of the suspect accounting transactions by a lower-level accounting executive at WorldCom, defendant Sullivan unsuccessfully attempted to delay and hinder an audit review.  See id.

63. Following a brief attempt by defendants Myers and Sullivan to justify these fraudulent and improper accounting transactions to WorldCom's Board of Directors (the "Board"), WorldCom's Audit Committee determined that a restatement of the financial statements in the amount of $3.9 billion was in order.  See id.

64. Defendant Myers subsequently resigned as WorldCom's Controller. Defendant Sullivan was terminated from his position without a severance package.

65. The Section 21(a)(1) Statement confirmed that WorldCom's SEC filings during 2001 and the first quarter of 2002 were prepared under the direction of, and signed by, Mr. Sullivan.  See id.

66. Shortly after July 8, 2002, the U.S. Justice Department began an investigation of WorldCom to probe the criminal behavior by such current and former company executives.

67. On August 1, 2002, defendants Sullivan and Myers surrendered to federal authorities in Manhattan, to face criminal charges of securities fraud and conspiracy to commit securities fraud.  Defendant Sullivan and defendant Yates, a former accounting executive of WorldCom, were indicted on August 28, 2002, on these charges.  The indictment included allegations that Sullivan and Yates engaged in an illegal scheme to defraud investors, failed to disclose transfers to WorldCom's auditors, and made false statements in public filings.

68. In August 2002, WorldCom revealed additional accounting irregularities and determined that, in total, its financial statements for 2000, 2001 and first and second quarter of 2002 had been overstated by $7.2 billion.  At that time, WorldCom indicated that there would likely be more corrections and restatements to come.

69. On or about September 27, 2002, Mr. Myers pleaded guilty to three of the indictment's felony counts: fraud, conspiracy, and making false filings with the SEC. In connection with his plea, he admitted assisting senior WorldCom management in manufacturing phony "profits" for the company and in defrauding investors as part of a scheme designed to create the appearance that WorldCom was meeting Wall Street's expectations.  A true and correct copy of relevant portions of the transcript of Mr. Myers's plea allocution is attached hereto as Exhibit 13.

70. During the allocution of his guilty plea, Mr. Myers admitted that WorldCom's senior management had instructed him to manipulate WorldCom's financials so as to improperly reduce reported costs and increase reported earnings.  Mr. Myers reiterated what had been previously stated in WorldCom's Section 21(a)(1) Statement; there was no documentation to support, and no conceivable justification for WorldCom's decision to categorize line costs as capital expenditures rather than expenses. See Exhibit 13.

71. Three more WorldCom accounting executives—Mr. Yates, Ms. Vinson and Mr. Normand—soon pleaded guilty to charges that they had helped carry out the massive accounting fraud at WorldCom.  A true and correct copy of relevant portions of the transcript of Mr. Yates', Ms. Vinson's, and Mr. Normand's plea allocutions are attached hereto as Exhibits 14, 15, and 16, respectively.

72. Mr. Yates admitted in his guilty plea that Messrs. Myers and Sullivan personally directed him to perform the improper accounting adjustments. At first, Mr. Yates asserted that he "strenuously objected" to the accounting adjustments he was pressured to make. He ultimately relented, however, after he was assured that the illegal accounting entries had been approved at WorldCom's highest management levels. See Exhibit 14.

73. Ms. Vinson and Mr. Normand, who had oversight responsibilities in respect of WorldCom's financial record-keeping, admitted during the allocutions of their guilty pleas they had been ordered to transfer enormous sums of expenses in order to hide the company's financial troubles from the public. See Exhibits 15 and 16.

74. Finally, on March 2, 2004, after almost two years of denying any wrongful involvement with regard to the titanic fraud committed by WorldCom and certain directors and officers, Mr. Sullivan pleaded guilty to conspiracy to commit securities fraud, making false filings with the SEC, keeping false books and records, securities fraud, and willfully causing WorldCom to file false and misleading financial documents. A true and correct copy of relevant portions of the transcript of Mr. Sullivan's plea allocution is attached hereto as Exhibit 17.

75. Mr. Sullivan admitted that there was no legitimate justification or basis for the accounting adjustments made to WorldCom's books, and that as a result of these improper actions WorldCom's financial statements were false and misleading. See Exhibit 17.

76. On May 24, 2004, a grand jury in the Southern District of New York leveled six new charges against Ebbers, WorldCom's former CEO, who now faces 9 counts,

including one count of conspiracy to commit securities fraud, one count of securities fraud and six counts of false filings with the SEC.  A true and correct copy of the Ebbers indictment is attached hereto as Exhibit 18.

77. The indictment charges that Messrs. Ebbers and Sullivan conspired by providing false and fraudulent information to the investing public through fraudulent adjustments to WorldCom's books and records, and by making false and misleading statements and omissions in SEC filings.  See Exhibit 18, at ¶¶ 17-18.

78. The indictment further charges that when Mr. Sullivan counseled Mr. Ebbers to issue an "earnings warning" regarding WorldCom's "deteriorating financial performance," Mr. Ebbers refused and instead, along with Mr. Sullivan, "instructed subordinates to falsify book entries."  See id. at ¶¶ 20-21.

79. The indictment further charges that, in or about June 2001, WorldCom created a process called "Close the Gap" that was "designed solely to identify adjustments that would increase reported revenue," and that Messrs. Ebbers and Sullivan instructed subordinates to make those adjustments.  See id. at ¶ 25.

80. Further, the indictment charges that Mr. Ebbers, along with other co-conspirators, "disguised WorldCom's true operating performance and financial condition" by directing and concealing those adjustments to WorldCom's expenses and revenue.  See id. at ¶ 33.

81. On March 12, 2004, WorldCom filed its Form 10-K for the fiscal year ending December 31, 2002, in which it restated its financials for fiscal years 2000 and 2001.  Here, WorldCom's massive fraud was revealed in stark relief; it restated its pre-tax income previously reported at $7.6 billion in 2000 to the *real* pre-tax *loss* of $49.9

billion for that year. For 2001, WorldCom restated its pre-tax income previously reported at $2.3 billion to the real pre-tax *loss* of $14.5 billion. A true and correct copy of relevant portions of WorldCom's 2002 10-K is attached hereto as Exhibit 19.

82. As noted by Mr. Breeden in his August 2003 Report to the Honorable Jed S. Rakoff, "more than 75% of the assets reported on the Company's balance sheet turned out to be accounting helium rather than tangible sources of net worth." A true and correct copy of the August 2003 Report, entitled "Restoring Trust," is attached hereto as Exhibit 20.

83. In sum, WorldCom was nothing like the financially healthy, robust corporation with excellent prospects for continued growth—and shareholder satisfaction—that was portrayed in the false and misleading documents upon which WorldCom predicated its applications for D&O insurance, including in its application for the SRI Policy.

## THE FRAUD

84. WorldCom committed actual fraud when its employees, acting at the direction of their superiors in executive management (as noted above), made significant and improper accounting entries following the close of many quarters in order to falsely report that the Company had achieved the unrealistic revenue growth targets set by Defendants Ebbers and Sullivan and disseminated to the public.

85. None of these accounting manipulations, directed by senior management, including Defendants Ebbers and Sullivan, with the assistance of Defendants Yates, Normand, Myers and Vinson, had any documentation or support, and were known to be improper at the time they were ordered and carried out.

86. The earliest known manipulations involved the improper release of depreciation reserves and the reclassification of Selling, General and Administrative ("SG&A") expenses, and over the relevant period (1999 through the beginning of 2002) the combined manipulation of these items amounted to improper and fraudulent entries totaling approximately $2.876 billion.  See Exhibit 11, at 195, 212.

87. Beginning in 1999, many of the improper entries were made to the "Corporate Unallocated" revenue account in an amount estimated to be well over $1 billion (which was separately reported to Defendant Ebbers each month), even though both Defendant Ebbers and Defendant Sullivan knew that these non-recurring items improperly and deceptively increased the revenues reported.  See id. at 130-31, 134, 136-37.

88. From the middle of 1999 through 2000, WorldCom reduced its reported "line costs" by approximately $3.3 billion by improperly releasing "accruals" or those reserves set aside for anticipated expenses, often entirely unrelated to the line costs the accruals were being used to offset.  By releasing these reserves, WorldCom was able to offset reported line costs, reducing expenses and improperly and deceptively increasing the reported pre-tax income.  See id. at 61-62.

89. By the end of 2000, WorldCom had depleted the available reserves it had previously been manipulating, however, the continuing pressure of the Company's stock price, and the need to meet those unrealistic analysts' expectations drove Defendant Ebbers and Sullivan, with the assistance of the aforementioned defendant officers and employees, to find new ways to manipulate WorldCom's books and

defraud its investors, creditors, the financial markets, its insurers and the rest of the public at large. See Exhibit 11, at 89-90.

90. In the first quarter of 2001 through the first quarter of 2002, WorldCom reduced its reported line costs by approximately $3.9 billion by improperly capitalizing roughly $3.5 billion of those costs, which avoided the immediate impact of properly expensing, or recognizing the costs and in turn increased pre-tax income. But for this scheme, WorldCom would have been forced to report pre-tax losses in three of the five quarters in which it engaged in this fraud. See id. at 90-92.

91. Accounting for line costs in the above manner was a blatant and egregious violation of generally accepted accounting principles ("GAAP"), which prohibits the capitalization of ongoing expenses, or "line costs", since these expenses do not generate future value. See id. at 138, 149, 185.

92. Additional accounting gimmickry, improperly employed in order to create WorldCom's "smoke and mirrors"-styled earnings reports, included the improper reduction of income taxes, the establishment of excess general accrual accounts, which were then released in order to increase reported income and meet those unrealistic targets, allocation of costs, the issuing of tracker stocks, and the improper valuation on balance sheets of WorldCom's goodwill and intangible assets.

93. All of this financial chicanery was ultimately disseminated to the world via WorldCom's financial filings with the SEC in the form of its 1999, 2000, and 2001 10-K reports, along with all interim financial reporting such as the 10-Qs for those relevant years, as well as WorldCom's prospectuses, proxy statements, and public statements made about its financial health.

94. WorldCom's 10-K filings for 1999, 2000, and 2001 were signed by all of its directors.  The 2000 10-K was signed on March 31, 2001 by Defendants Sullivan, Defendant Alexander, Defendant Allen, Defendant Areen, Defendant Aycock, Defendant Bobbit, Defendant Ebbers, Defendant Galesi, Defendant Kellet, Defendant Macklin, Defendant Roberts and Defendant Sidgmore.  A true and correct copy of the 2000 10-K Signature Page is attached hereto as Exhibit 21.

95. This scheme was conceived and directed by WorldCom's senior management, chiefly Defendants Ebbers and Sullivan, and carried out by their minions, Defendants Vinson, Normand, Myers and Yates, under the noses of a Board of Directors displaying willful and deliberate indifference to the bizarre and destructive management of this Fortune 500 Company.

## FAILURE OF CORPORATE GOVERNANCE AND RECKLESS ACTION AND INACTION OF WORLDCOM'S BOARD OF DIRECTORS

96. As Corporate Monitor Breeden quoted in his report to the Honorable Jed S. Rakoff, "[p]ower tends to corrupt, and absolute power corrupts absolutely." See Exhibit 20, at 1.  This was clearly the case at WorldCom, where the Board willful abdication of its responsibilities and purposeful ignorance allowed Ebbers to rule absent the resistance to such corruption required and demanded of the Board charged with overseeing the direction of WorldCom.

### *Board of Directors*

97.  According to Breeden,

> The board of directors of the Company consistently ceded power over the direction of the Company to Ebbers.  As CEO, *Ebbers was allowed nearly imperial reign* over the affairs of the Company, without the board of directors

exercising any apparent restraint on his actions, even
though he did not appear to possess the experience or
training to be remotely qualified for his position.  One
cannot say that the checks and balances against excessive
power within the old WorldCom didn't work adequately.
Rather, the sad fact is that there were *no checks and
balances*.

Exhibit 20, at 1-2 (*emphasis added*).

98. Nearly all of WorldCom's directors had been owners, directors, or officers

of companies swallowed up by WorldCom during its acquisition phase and,

accordingly, "enjoyed very great financial benefits from Ebbers' deals" and held a

"significant amount of WorldCom stock." See Exhibit 11, at 265-67.

99. The Directors received compensation in the form of cash and stock options,

"with overall compensation heavily weighted toward the latter." See id. at 266.

100.   Among the improprieties to which it turned its back, the Board allowed

Defendant Ebbers to pay out $238 million in "retention grants" to executives and

employees, with absolutely no standards or supervision, leaving these grants to become

something of a "giant compensation slush fund" and allowing Mr. Ebbers and Mr.

Sullivan "an even greater ability to buy personal loyalty at a time when the fraudulent

reporting was growing substantially." See Exhibit 20, at 28-29.

101.  The Board made absolutely no effort to restrict Defendant  Ebbers from

building his own personal empire of businesses, including a Louisiana rice farm, a

luxury yacht building company, a lumber mill, a country club, a trucking company, a

minor league hockey team, an operating marina, and a building in downtown Chicago,

all improperly at the expense of WorldCom. See Exhibit 11, at 33, 294-95.

102.  In fact, the Board actually appeared to encourage Defendant Ebbers'
pursuit of these improper outside activities, by approving corporate loans and
guarantees that eventually grew to $408 million by April 29, 2002.  <u>See id.</u> at 32, 293-
94.

103.  Defendant Ebbers appeared to have well-placed allies on the Board,
including Defendants Kellet and Bobbit, Chairs of the Compensation and Stock Option
Committee and Audit Committee, respectively, allowing him to push through loans that
"had no conceivable benefit to WorldCom's shareholders."  <u>See</u> Exhibit 20, at 26 n.24.

104.  Defendants Kellet and Bobbit improperly abetted Defendant Ebbers'
participation in these improper endeavors by permitting WorldCom's money to be used
for "massive personal loans to help support his personal debt."  <u>See id.</u> at 28 (citing
Exhibit 11, at 296-98).

105.  Apparently, about $50 million of these loans was actually wired to Mr.
Ebbers before "the board of directors as a whole was ever notified."  However, the
remainder of the Board did not balk at these loans when they finally learned of them,
but instead ratified the actions of Defendants Kellet and Bobbit.  <u>See id.</u> at 28 (citing
Exhibit 11, at 298).

106.  According to Corporate Monitor Breeden, both Mr. Stiles and Mr. Kellet

> received millions of dollars worth of WorldCom stock
> when Ebbers acquired predecessor companies.  Both men
> had been involved in business with Ebbers for years, and
> both owed a substantial portion of their net worth to his
> actions.  This made them uniquely poor choices to
> represent the interests of WorldCom's shareholders in
> exercising oversight responsibilities over Ebbers.

<u>See</u> Exhibit 20, at 28.

23

107.   In fact, the Special Investigative Committee opined "that the extension of these loans and guaranties was a 19-month sequence of terrible decisions—badly conceived and antithetical to shareholder interests—and a major failure of corporate governance.  Indeed we do not understand how the Compensation Committee or the Board could have concluded that these loans were an acceptable use of more than $400 million of the shareholder's money."  See Exhibit 11, at 32.

108.  The Special Investigative Committee also noted that Compensation Committee minutes noted "the likely impact on the Company's already depressed stock price of a sale of Mr. Ebbers' stock. . ." as one of the reasons for the approval of the Ebbers' loan.  See id. at 296.

109.  In an effort to protect the price of the stock, of which the directors held enormous amounts, and effectively cover their lapse in allowing Defendant Ebbers such free reign in building his own personal empire, the Compensation Committee, and subsequently, by ratification, the full Board, granted Ebbers the first $50 million of what would eventually grow to an astronomical $400 million plus of loans.  See id. at 296, 303.

110.   The Board also acquiesced to "a desperation device utilized by Ebbers to prop up the value of WorldCom stock."  Defendant Ebbers created a "tracker stock" for MCI, separate from WorldCom's, and by "allocating an artificially high level of corporate costs to the MCI results, the relative performance of the WorldCom stock could be made to appear better than consolidated performance" of WorldCom and MCI.  See Exhibit 20, at 27 n.25.

111.   The Board as a whole acted with deliberate and reckless indifference, by ceding nearly complete authority to Mr. Ebbers and his officers to do whatever they wished with the Company, running it like a personal fiefdom, instead of the Fortune 500 Company it was purported to be.

112.   On average, the Board met only quarterly and interaction between the outside directors and WorldCom management was minimal at best.  <u>See</u> Exhibit 11, at 267.

113.   The only arguably significant interactions would occur about a week prior to the infrequent Board meetings, when the directors would receive packets of materials including an agenda, financial information, draft minutes of the previous meeting, information from the Investor Relations department and resolutions to consider for the imminent meetings.  <u>See id.</u>

114.   The meetings themselves were simply series of canned and sanitized presentations and, until April 2002, the outside directors never held separate meetings. <u>See id.</u> at 268.

115.   The Board took almost no interest in the management of the Company, and as a result could exert no control over the Company agenda.  <u>See id.</u> at 10.

116.   The directors were so egregiously and deliberately indifferent to their responsibilities of oversight and direction, and acquiesced so willingly to Defendant Ebbers' demands, that they are accountable in the same manner as if they had actual knowledge of and sanctioned the rampant frauds perpetrated by WorldCom's management.

*Audit Committee*

117.  An examination of the actions, or more correctly, the inactions and derelictions of the Audit Committee, helps to bring the Board's "asleep at the wheel" posture and reckless indifference into sharper focus.

118.  The Audit Committee was responsible for overseeing WorldCom's Internal Audit Department, its external auditors, and management's financial reporting procedures.  See Exhibit 11, at 275.

119.  The Audit Committee met only three to five times per year, and even those few meetings lasted only about one hour each.  See id. at 274.  This was hardly the level of involvement necessary to oversee the activities of a company with more than $30 billion in revenue.  See Exhibit 20, at 32.

120.  Incredibly, the Audit Committee did not even hold any special meetings until June 2002, when all the damage had already been done. See Exhibit 11, at 274.

121.  Although a member of the Internal Audit Department and a representative of Arthur Andersen were supposed to be present at Audit Committee meetings, and while Defendant Bobbit insisted that a member of WorldCom's Internal Audit Department was always present at Andersen presentations, "minutes from the meetings where such presentations were given do not indicate that a representative from Internal Audit was present." See id. at 275.

122.  The continuing egregious and deliberate indifference of the Audit Committee's members to their responsibilities of oversight and direction render those directors accountable in the same manner as if they had actual knowledge of and sanctioned the rampant frauds perpetrated by WorldCom's management.

*Compensation Committee*

123.    The Compensation Committee met more regularly than the Audit Committee between 1999 and 2001, especially after the public became aware of the loans the Board had granted to Mr. Ebbers. See Exhibit 11, at 269.

124.  Although the extent of the Compensation Committee's authority was generally described in WorldCom's 1993 Charter, subsequent proxy statements might have encouraged the Committee to exercise broader authority and this "lack of clarity" apparently emboldened the Committee to approve the substantial loans to Mr. Ebbers without the initial approval of the full Board. See id. at 270.

125.  Other events lead to further inferences of wrongdoing within the Compensation Committee, from which Mr. Borghardt, WorldCom's General Counsel of Corporate Development, was excluded when the loans to Defendant Ebbers were initially introduced and discussed.  See id. at 297.

126.  Members of the Compensation Committee demonstrated their awareness that the loans to Defendant Ebbers were improper when, for example, Defendants Kellet and Bobbit "instructed Borghardt to "tell Stephanie [Scott] if they hear of discussion with anyone other than Scott [Sullivan] or me [about the loans] it is [the] basis for termination." See id. at 298.

127.  The Compensation Committee's abdication of its duties included its almost total deference to Defendant Ebbers' preferences for salary treatment, whose recommendations on executive salaries were of "paramount importance." See Exhibit 11, at 270-71.

128.  The salary of Bert C. Roberts, a director for WorldCom, for example, was maintained at $1,050,000 following the MCI merger, even though Roberts no longer had an active role in WorldCom, and his employment agreement had expired in 1999. See id. at 271.

129.  The Compensation Committee further abdicated its responsibilities when, even after Sidgmore took over the reigns of WorldCom in April 2002, it allowed him to continue as the CEO of another company, ECI2, without any questions from or debate within the Compensation Committee.  See id. at 272.

130.  Moreover, Defendant Kellet, the chair of the Compensation Committee, expressed no concern when Defendant Sidgmore attempted to split his compensation between himself and two ECI2 executives that he brought with him to WorldCom.  See id. at 272 n.88.

131.  The continuing egregious and deliberate indifference of the Compensation and Stock Option Committee's members to their responsibilities of oversight and direction render those directors accountable in the same manner as if they had actual knowledge of and sanctioned the rampant frauds perpetrated by WorldCom's management.

## INDIVIDUAL DIRECTORS' SELF INTEREST AND PERSONAL GAIN

### *Defendant Ebbers*

132.  Defendant Ebbers and the companies he controlled secured loans through commercial banks, many of which were margin loans secured by shares of Defendant Ebbers' WorldCom stock.  See Exhibit 11, at 295.

133. Defendant Ebbers incurred massive debt into the hundreds of millions of dollars through the use of these margin loans, and exposed him to personal ruin as WorldCom stock declined in value.  See id.

134. In the middle of 2000, Bank of America informed Defendant Ebbers "that he was in default and cal[ed] for him either to pledge additional collateral or to reduce his outstanding loan amount."  In response, Defendant Ebbers and his long-time friend Defendant Kellet devised the plan for the $50 million loan (referenced above) that was ultimately approved by the Compensation Committee, but disclosed to the full Board only long after it had been disbursed.  See id. at 296.

135. The commercial formalities that would be expected in a loan of such size were entirely disregarded, and critical issues such as interest rate, the maturity date for repayment, and even security for the loan were not addressed by the Compensation Committee.  See id. at 297.

136. By late September 2000, Defendant Ebbers had exhausted these loans, and after receiving additional margin calls, sold three million shares of his WorldCom stock.  See id. at 298.

137. Although the amounts loaned to Defendant Ebbers were "for payment of certain of [Ebbers's] obligations to institutional lenders which are secured by shares of Company Stock held by Ebbers," Defendant Ebbers actually used these amounts "for working capital for his luxury boat building business and his rice farms."  Neither the Board nor the Committee made any efforts to enforce these terms.  See Exhibit 11, at 308.

138. Defendant Ebbers sold this stock although he possessed material nonpublic information of the widespread fraud and accounting improprieties being perpetuated by WorldCom management, including himself, during that time.

139. Defendant Ebbers sold his stock although he was in possession of material nonpublic information about WorldCom's decline in growth rate and the decision to issue tracking stock at the time he entered into the sale arrangement. See id. at 322.

## Defendant Kellet

140. In the fall of 2000, the Board permitted Defendant Kellet to sell shares without adequate investigation into whether he possessed information regarding the "undisclosed loans to Ebbers" that was sufficient to preclude such trades, since Defendant Kellet apparently "sold his shares at the same time the Committee was using corporate assets to protect against a decline in WorldCom's stock price." See Exhibit 11, at 327.

141. Defendant Kellet sold such stock even though he was in possession of material nonpublic information about the company in the form of the undisclosed loans to Defendant Ebbers.

142. Defendant Kellet entered into a lease arrangement with WorldCom through Ebbers for a Falcon 20 airplane, receiving, as the Chairman of the Compensation Committee, something of value from the Chief Executive Officer of the Company, which compromised Kellet's ability to act with the requisite independence necessary for a director. See Exhibit 11, at 329, 333.

143. The lease arrangement included payment to WorldCom of a $400 per hour flight fee along with a $1 per month fee, and Kellet would remain responsible for costs

of insurance, pilots, hanger expense and fuel. This arrangement was below its fair market value and should have been disclosed. See id. at 330, 333.

144. Defendant Kellet did not disclose the lease arrangement on the Directors and Officers questionnaire that he and other Directors' were required to fill out annually, and WorldCom did not disclose the lease arrangement with the SEC. See id. at 331.

145. Mr. Breeden recommended that WorldCom obtain additional amounts owed under the lease arrangement and that Defendant Kellet be removed from the Board. See id. at 333.

146. In October 2002, Kellet paid the balance necessary to reimburse WorldCom for his use of the airplane at a rate of $3,000 per hour and resigned from the Board of Directors. See id. at 34.

## Defendant Sullivan

147. Defendant Sullivan sold 475,000 shares of WorldCom stock on August 1, 2000, after he directed the false and fraudulent accounting moves, but before any of those accounting improprieties had been disclosed. See Exhibit 11, at 313.

148. Defendant Sullivan was permitted by Defendant Ebbers to use the Company airplane for personal use at a rate of $1,800 per hour, which would be charged against his bonus. See id. at 337.

## Defendant Beaumont

149. Defendant Beaumont accepted over $600,000 in personal loans from Defendant Ebbers in October 2000 and February 2002 respectively, with a good portion of that money coming from the loans secured by Ebbers from the Company in order to

31

pay off his outstanding debt that was secured by WorldCom stock. See Exhibit 11, at 308-09.

## *Defendant Galesi*

150.  In Fall 2000, the Board permitted Defendant Galesi to sell shares without adequate investigation into whether he was in possession of information regarding the "undisclosed loans to Ebbers" that would have prohibited such trades, as it appears that Defendant Galesi "sold his shares at the same time corporate assets were being used to protect against a decline in WorldCom's stock price." See Exhibit 11, at 327.

151.  Defendant Galesi sold these shares even though he was in possession of material nonpublic information about the company in the form of the undisclosed loans to Defendant Ebbers.

## *Defendant Roberts*

152.  Defendant Roberts was reimbursed by WorldCom for his personal use of his own airplane. See Exhibit 11, at 336.

153.   The arrangement does not appear to have been presented to or approved by the Compensation Committee. See id.

## *Defendant Sidgmore*

154.   Defendant Sidgmore was permitted by Ebbers to use Company airplanes in a manner not approved by the Compensation Committee, contrary to IRS regulations and apparently in violation of applicable FAA regulations. See Exhibit 11, at 337.

155.  On January 3, 2000 Ebbers sent a memorandum to Sidgmore and Sullivan indicating that they could use the Company airplane at a rate of $1,800 per hour that

would be charged against their bonus and was calculated by doubling the cost of flying the plane for one hour.  See id.

## WORLDCOM'S 2002 RESTATEMENT: THE TRUTH EMERGES

156.  In WorldCom's 2002 10-K, filed on March 12, 2004, WorldCom restated its previously reported consolidated financial statements for the fiscal years ending December 31, 2001 and 2000.  See Exhibit 19, at F24-34.

157.  The restatement resulted in a cumulative net reduction to shareholders' equity of $70.8 billion in 2001 and $53.6 billion in 2000, as well as a reduction in previously reported net income of $17.1 billion and $53.1 billion for the years ending on December 31, 2001 and 2000, respectively.  See id. at F-25.

158.  WorldCom noted that in its restatement process, specifically with respect to those "accounting irregularities" that sparked the Company's downward spiral, "the Company identified a substantial number of material weaknesses in the Company's internal controls, including poor accounting records.  See id.

159.  For the year ending December 31, 2001, WorldCom had previously reported pre-tax income of $2.38 billion, but was forced to restate that figure due to its improper and fraudulent treatment of line costs (now called "access costs" in their 2002 10-K), along with other adjustments to reflect real values for the 2001 year ending of a pre-tax *loss* of $14.5 billion.  See Exhibit 19, at F-26.

160.  For the year ending December 31, 2000 WorldCom had previously reported pre-tax income of $7.58 billion, but was forced to restate that figure due to its improper and fraudulent treatment of line costs (now called "access costs" in their 2002

10-K), along with other adjustments to reflect real values for the 2000 year ending of a pre-tax *loss* of $49.9 billion. See id.

161. For the year ending December 31, 2001 WorldCom had previously reported its total asset value at $103.7 billion, but was required to restate that figure because the company initially failed to perform an impairment analysis for 2001, even though impairment indicators were present. WorldCom's restated total asset value for 2001 is $33.7 billion. See id. at F-33.

162. For the year ending December 31, 2000 WorldCom had previously reported its total asset value at $98.7 billion but was required to restate that figure because the company initially failed to perform an impairment analysis for 2000 even though impairment indicators were present. WorldCom's restated total asset value for 2000 is $44.2 billion. See id.

163. WorldCom was forced to acknowledge that in respect to 2000 and 2001, "the Company found no evidence that SFAS 121 [Statement of Financial Accounting Standards] impairment analyses had been previously performed even though trigger events were apparent." See id. at F-27.

164. In the Restatement, WorldCom finally admitted that in 2000, in contrast to what was earlier reported, it experienced a

> significant decrease in projected revenue and operating profit principally as a result of adverse changes in the business climate, specifically the telecommunications industry, when expected traffic growth failed to materialize. This resulted in overcapacity, reduced growth rates in revenue and cash flows and the beginning of a period of industry consolidation.

See Exhibit 19, at F-35.

165.  Further, according to WorldCom, the Company was involved in a number of acquisitions at "prices inflated by the optimism in the telecommunication industry . . . [t]he premium paid [for those acquisitions], coupled with the Company's inability to adequately integrate disparate assets from those acquisitions, led to a balance sheet with excessive debt and a significant amount of goodwill."  See id. at F-35, 36.

166.  In 2001, according to WorldCom in its *mea culpa*-like restatement, "impairment indicators occurred including continued adverse conditions within the industry, poor financial performance of the business, declining prices for telecommunications services and a depressed stock price which led to further reduction in cash flow projections."  See id. at F-36.

167.  WorldCom essentially hid all of these problems from the public, not only by affirmatively manipulating its books with false and unsupportable actions, but also ignoring indicators that would necessitate a review of their other financials, which would inevitably adversely affect the ability to meet analysts' expectations.

## WORLDCOM'S FRAUD ON THE MARKET

168.  The same information WorldCom used to defraud SRI was disseminated to, and perpetrated a fraud upon, the financial markets and the public.  As is now well known, WorldCom's enormous fraud devastated the financial markets and caused the value of WorldCom's shares to plummet to nearly nothing.  Before WorldCom's lies and manipulations came to light, investors purchased shares at prices that bore no relation to any true market value for the Company.

169.  In its annual report for the fiscal year ending December 31, 2000, WorldCom knowingly provided the market with false financial results, which grossly

distorted the price of its shares. For example, it reported that it had net income of over

$4 billion for fiscal 2000 and had earned $1.43 per share on a diluted basis. <u>See</u>

WorldCom's 2000 Proxy Statement and Prospectus, submitted on April 26, 2001, at F-

13, of which a true and correct copy of relevant portions is attached hereto as Exhibit

22.

170.  WorldCom's dissemination of these false financial results to the market

caused its stock prices to inflate well beyond their true value. WorldCom's financial

results did not include the adjustments required to render them a fair and accurate

presentation of its financial condition.

171.  WorldCom's dissemination to the market of the same false and fraudulent

data it used to procure its D&O coverage, including the SRI policy, made it inevitable

that when the truth was revealed, its stock prices would crash and its distraught

stockholders would bring a myriad of suits against WorldCom's directors and officers.

Had WorldCom not flooded the market with such false and fraudulent data, its stock

would not have crashed and its investors would not have had reason to bring suits

against its directors and officers.

## EFFORTS TO ADVISE WORLDCOM OF THE POLICY'S RESCISSION

172.  Like the regulatory bodies, law enforcement agencies, and the general

public, SRI did not discover and could not have, in the exercise of reasonable care,

discovered that the financial information reported by WorldCom and incorporated into

its application for the SRI policy, was false and fraudulent until WorldCom publicly

announced its use of the improper and deceptive accounting practices.

173.  As SRI began to learn of the magnitude of WorldCom's misrepresentations, it determined that the SRI Policy was subject to rescission and was *void ab initio* because of the material misrepresentations made by WorldCom in connection with its application for and procurement of the SRI policy.  On August 13, 2002, counsel for SRI sent Willis a letter intended to notify WorldCom that the policy was being rescinded and was *void ab initio*.  A true and correct copy of the August 12, 2002 letter is attached hereto as Exhibit 23.

174.  In response to SRI's notice that its policy was being rescinded, in a letter dated August 14, 2002, WorldCom's attorneys asserted that the automatic stay, effectuated by Section 362 of the Bankruptcy Code after WorldCom's bankruptcy filing on July 21, 2002, prohibited SRI from rescinding the policy.  A true and correct copy of the August 14, 2002 letter is attached hereto as Exhibit 24.

175.  On January 28, 2003, WorldCom brought an adversary proceeding in the bankruptcy court for an adjudication of the rights and responsibilities of WorldCom and its excess insurers under the policies.

176.  On September 22, 2003, SRI filed an answer to WorldCom's declaratory judgment complaint along with a counterclaim for rescission, naming directors and officers of WorldCom as additional defendants on the counterclaim.

177.  On May 14, 2004, U.S. Bankruptcy Court Judge Gonzalez granted the motions of Twin City Insurance Company and Associated Electric Gas and Insurance Services, two other excess insurers of WorldCom, and dismissed the adversary proceeding as against them on the grounds that WorldCom had only a minimal interest in the policies and that, therefore, the bankruptcy court was the improper forum to

adjudicate the coverage disputes. <u>See</u> Order Granting Motions to Dismiss Compliant Against Defendants, Docket No. 02-13533, Adv. Pro. No. 03-2058A (Bankr. S.D.N.Y. May 14, 2004).

178.  SRI followed this with a similar motion to dismiss the adversary proceeding on June 4, 2004, and now brings this action in the U.S. District Court for a declaratory judgment that the SRI Policy is rescinded and void *ab initio*.

## COUNT I

### <u>RESCISSION OF THE SRI POLICY AS AGAINST MCI, AND ANY PREDECESSOR IN INTEREST BASED ON MATERIAL MISREPRESENTATIONS IN THE APPLICATION</u>

179.  Plaintiffs repeat and reallege the allegations of paragraphs 1-178 of this complaint as if fully set forth herein.

180.  WorldCom included false and materially misleading information, particularly misleading information regarding its financial condition, in its application for the SRI Policy.

181.  WorldCom failed to disclose its use of improper, false and misleading accounting methods and false and fraudulent financial information in connection with its application for and procurement of the SRI Policy.

182.  SRI's underwriters did not know and could not have reasonably been expected to know, prior to the time the coverage was bound, that the financial information proffered by WorldCom in support of the application was false and misleading.

183.  WorldCom knew or should have known that SRI would rely on the financial statements of the company in deciding whether and on what terms to issue its Policy.

184.  SRI reasonably relied on the false and fraudulent financial information which WorldCom had submitted to the SEC and which it included by reference in support of its application and SRI was materially misled thereby about WorldCom's true financial condition.

185.  The financial condition and health of a corporate applicant for a D&O policy, along with its accounting practices, are among the most critical factors considered by SRI in the D&O underwriting process.

186.  Through its intentional use of improper and illegal accounting methods and practices in the characterization of line costs, and its failure to properly write down the value of goodwill and intangible assets, WorldCom false and grossly manipulated its reported earnings for at least the years 2000 and 2001, thereby falsely portraying WorldCom as a financially healthy corporation.

187.  Had SRI been provided with accurate financial information and/or been aware of WorldCom's use of illegal and improper accounting methods, it would never have agreed to provide the D&O insurance coverage sought by WorldCom.

188.  Had SRI been aware of WorldCom's true financial condition it would never have agreed to provide the D&O insurance coverage sought by WorldCom.

189.  The material misrepresentations, false statements, omissions and misleading statements improperly used by WorldCom to procure the SRI Policy render it subject to rescission and *void ab initio*.

190.  SRI has advised WorldCom and its directors and officers that the SRI

Policy is subject to rescission and is *void ab initio*.  WorldCom and its directors and

officers are and have been aware of this and are and have been aware that SRI intends

to rescind the policy.

191.  In connection with the rescission of the policy, SRI has tendered, or has

attempted to tender, the premiums that WorldCom paid for its D&O insurance

coverage.

192.  SRI is entitled to a judgment declaring that the SRI Policy is rescinded and

*void ab initio*, and otherwise unenforceable.

## COUNT II

### RESCISSION OF THE SRI POLICY AS AGAINST THE DEFENDANT DIRECTORS AND OFFICERS AND ANY OTHER PAST DIRECTORS AND OFFICERS, BASED UPON MATERIAL MISREPRESENTATIONS IN THE POLICY APPLICATION

193.  Plaintiffs repeat and reallege the allegations of paragraphs 1-192 of this

complaint as if fully set forth herein.

194.  WorldCom's former directors and officers, including but not necessarily

limited to those specifically named in the securities class action lawsuits, are defined as

Insureds under the SRI Policy in certain circumstances.

195.  All such directors and officers knew, or reasonably should have known,

that WorldCom would procure such directors and officers liability coverage on their

behalf.

196.  All such directors and officers knew, or reasonably should have known,

that WorldCom would submit an application, including company information and

financial documents, in support of procurement of such directors and officers liability coverage.

197. WorldCom submitted such an application to SRI on behalf of itself and those directors and officers, which included false, fraudulent and materially misleading information, particularly misleading information regarding its financial condition.

198. Those directors and officers submitted such an application to SRI that included false, fraudulent and materially misleading information, particularly misleading information regarding the company's financial condition.

199. WorldCom concealed and intentionally failed to disclose its use of improper, false and misleading accounting methods and false and fraudulent financial information in connection with its application for and procurement of the SRI Policy.

200. SRI's underwriters did not know and could not have reasonably been expected to know, or discover, prior to the time the coverage was bound, that the financial information proffered by WorldCom and its directors and officers was false and misleading.

201. WorldCom and its directors and officers intended for SRI to rely on, and knew that SRI would rely on, the financial information and documentation submitted in connection with its application for the SRI Policy.

202. SRI reasonably relied on the false and fraudulent financial information submitted by WorldCom and its directors and officers and was materially misled thereby about WorldCom's true financial condition.

203.  The financial condition and accounting practices of an applicant for a

D&O policy are among the most critical factors considered by SRI in the underwriting

process.

204.  Through its intentional use of improper and illegal accounting methods

and practices in the characterization of line costs, and its failure to properly write down

the value of goodwill and intangible assets, WorldCom false and grossly manipulated

its reported earnings for at least the years 2000 and 2001, thereby falsely portraying

WorldCom as a financially healthy corporation. Had SRI been provided with accurate

financial information and/or been aware of WorldCom's utilization of illegal and

improper accounting methods, it would never have agreed to provide the D&O

insurance coverage sought by WorldCom.

205.  Had SRI been aware of WorldCom's true financial condition, it would

never have agreed to provide the D&O insurance coverage sought by WorldCom.

206.  The material misrepresentations, false statements, omissions and

misleading statements improperly used by WorldCom to procure the SRI Policy render

it subject to rescission and *void ab initio*.

207.  SRI has advised, or has attempted to advise, WorldCom and the directors

and officers that the SRI policy is subject to rescission and is *void ab initio*.  WorldCom

and the directors and officers are and have been aware of this and are and have been

aware that SRI is pursuing a judgment declaring that the SRI Policy is rescinded and

void *ab initio.*

208.  In connection with the rescission of the policy, SRI has tendered, or has attempted to tender, the premiums that WorldCom paid for its D&O insurance coverage.

209.  SRI is entitled to a judgment declaring that the SRI Policy is rescinded and void *ab initio* as against WorldCom and all others persons and entities, including WorldCom's former directors and officers.

## COUNT III

### RESCISSION OF THE POLICY AS AGAINST ALL NAMED DEFENDANTS AND ALL FORMER DIRECTORS AND OFFICERS BASED UPON FRAUD IN THE INDUCEMENT

210.  Plaintiffs repeat and reallege the allegations of paragraphs 1-209 of this complaint as if fully set forth herein.

211.  WorldCom intentionally included false, fraudulent and/or materially misleading information in its application package for the SRI Policy.

212.  WorldCom was aware that information included in its application package for the SRI Policy was false, fraudulent and/or materially misleading.

213.  WorldCom intended for SRI to rely on the false, fraudulent and/or materially misleading information that was included in WorldCom's application package for the SRI policy.

214.  SRI did not know and could not have reasonably been expected to know, prior to the time the coverage was bound, that information included in WorldCom's application package for the SRI Policy was false, fraudulent and/or materially misleading.

215.  SRI reasonably relied on the false, fraudulent and/or materially misleading information WorldCom included in its application package for the SRI Policy in deciding whether and on what terms to bind coverage and issue the SRI Policy.

216.  WorldCom's procurement of the SRI Policy by, *inter alia*, including false, fraudulent and materially misleading information in its application package for the SRI policy constituted fraud in the inducement.

217.  Accordingly, the SRI Policy is invalid, rescinded and void *ab initio*.

218.  SRI is entitled to a judgment for the damages arising out of SRI's binding of coverage as a result of WorldCom's procurement of the SRI Policy by, *inter alia*, including false, fraudulent and materially misleading information in its application package for the SRI Policy.

## COUNT IV

### RESCISSION AS AGAINST ALL  NAMED DEFENDANTS AND ALL FORMER DIRECTORS AND OFFICERS BASED UPON FRAUD ON THE MARKET

219.  Plaintiffs repeat and reallege the allegations of paragraphs 1-218 of this complaint as if fully set forth herein.

220.  WorldCom knowingly disseminated false and untrue information to the financial markets and the nation.

221.  This false and untrue information about the company's financial health and governance caused an inflated and untrue picture of the company's health to be formed in the eyes of the public and financial market place.

222.  WorldCom's false financial data was disseminated to and existed within an open and developed securities market, which allowed WorldCom to disseminate its false data to the investing public.

223.  WorldCom employed the following means to disseminate its false

information:

    a.   WorldCom common stock met the requirements for listing, and was listed

         and actively traded, on the NASDAQ;

    b.   As a regulated issuer, WorldCom filed periodic public reports with the

         SEC and the NASD;

    c.   Securities analysts followed WorldCom stock and issued reports based on

         published financial results.  Each of these reports was publicly available

         and entered the public marketplace; and

    d.   WorldCom regularly issued press releases, which were carried by national

         newswires.  Each of these releases was publicly available and entered the

         public marketplace.

224.  WorldCom's use of these methods ensured that its dissemination of false

and misleading financial data would have an enormous impact on the securities market.

225.  The individual directors and officers knew or should have reasonably

known that the information being disseminated to the public and financial markets was

untrue and false.

226.  This false and untrue information caused WorldCom's stock to rise vastly

beyond its true value.

227.  WorldCom's knowing creation and dissemination of the fraudulent

financial data vastly increased the "bargained for" fortuitous risk it sought to insure far

beyond what it would have been had WorldCom published its true financial results.

228.  WorldCom's intentional improper and illegal actions enormously increased the risk which it sought to insure, guaranteeing that when WorldCom's massive fraud was ultimately discovered and revealed, and its stock inevitably crashed, its deceived investors would retaliate with the myriad of lawsuits that have been filed against WorldCom's directors and officers.

229.  The SRI policy was intended to protect WorldCom and its directors and officers against fortuitous liability, and not liability arising from the intentional and insidious fraud visited upon the public, the financial markets, and its insurers with the intent to create an untrue picture of the company.

230.  As a matter of equity, WorldCom and the individual directors and officers cannot benefit from its use of fraudulent information to procure the SRI Policy when that same fraudulent data directly caused the losses for which WorldCom and its directors and officers now seek coverage.

231.  SRI is entitled to a judgment declaring that the SRI Policy is rescinded and *void ab initio*, and otherwise unenforceable.

232.  SRI is entitled to disclaim coverage for all claims arising from the lawsuits and other actions that WorldCom knew or reasonably should have known, before the inception of the SRI Policy, would inevitably result from this intentional and insidious fraud.

## COUNT V

## PRECLUSION OF COVERAGE UNDER THE "PROFIT OR ADVANTAGE" EXCLUSION

233.  Plaintiffs repeat and reallege the allegations of paragraphs 1-232 of this complaint as if fully set forth herein.

46

234.  Alternatively, and in the event the Court is unable to promptly determine that the SRI Policy is rescinded as to every defendant, SRI alleges that the following exclusion will apply to bar any rights of the directors and officers named as defendants in the instant action.

235.  The claims for which defendants herein seek coverage arose from, were based upon or were attributable to, in whole or in part, profit and/or advantage gained by an insured or insureds under the SRI Policy to which an insured was not legally entitled.

236.  Exclusion 4(a) of the underlying Nat Union Policy, to which the SRI Policy follows form, provides:  "The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:  (a) arising of, based upon or attributable to the gaining in fact of any profit or advantage to which an insured was not legally entitled."  See Exhibit 1.

237.  Accordingly, defendants are not entitled to coverage under the SRI Policy.

## COUNT VI

### PRECLUSION OF COVERAGE UNDER THE POLICY'S "INSIDER TRADING" EXCLUSION

238.  Plaintiffs repeat and reallege the allegations of paragraphs 1-237 of this complaint as if fully set forth herein.

239.  Alternatively, and in the event the Court is unable to promptly determine that the SRI Policy is rescinded as to every defendant, SRI alleges that the following exclusion will apply to bar any rights of the directors and officers named as defendants in the instant action.

240. The claims for which defendants herein seek coverage arose from, were based upon or were attributable to, in whole or in part, profits in fact made from the purchase or sale by an Insured of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of the statutory law or one or more states.

241. Exclusion 4(b) of the underlying Nat Union Policy, to which the SRI Policy follows form, provides: "The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

> Arising out of, based upon or attributable to: (1) profits in fact made from the purchase or sale by an Insured of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law…

See Exhibit 1.

242. Accordingly, defendants are not entitled to coverage under the SRI Policy.

# COUNT VII

## PRECLUSION OF COVERAGE UNDER THE "CRIMINAL ACT" EXCLUSION

243. Plaintiffs repeat and reallege the allegations of paragraphs 1-242 of this complaint as if fully set forth herein.

244. Alternatively, and in the event the Court is unable to promptly determine that the SRI Policy is rescinded as to every defendant, SRI alleges that the following exclusion will apply to bar any rights of certain directors and officers named as defendants in the instant action.

245. The claims for which defendants herein seek coverage arose from, were based upon or were attributable to, in whole or in part, the commission of criminal acts.

246. Exclusion 4(c) of the underlying Nat Union Policy, to which the SRI Policy follows form, provides: "The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured: arising out of, based upon or attributable to the committing in fact of any criminal . . . act." See Exhibit 1.

247. Accordingly, defendants are not entitled to coverage under the SRI Policy.

## COUNT VIII

### PRECLUSION OF COVERAGE UNDER THE "FRAUDULENT ACT" EXCLUSION

248. Plaintiffs repeat and reallege the allegations of paragraphs 1-247 of this complaint as if fully set forth herein.

249. Alternatively, and in the event the Court is unable to promptly determine that the SRI Policy is rescinded as to every defendant, SRI alleges that the following exclusion will apply to bar any rights of certain directors and officers named as defendants in the instant action.

250. The claims for which defendants herein seek coverage arose from, were based upon or were attributable to, in whole or in part, the commission of deliberate fraudulent acts.

251. Exclusion 4(c) of the underlying Nat Union Policy, to which the SRI Policy follows form, provides: "The Insured shall not be liable to make any payment for Loss in connection with a Claim made against an Insured: arising out of, based upon or attributable to the committing in fact of any . . . deliberate fraudulent act." See Exhibit 1.

252. Accordingly, defendants are not entitled to coverage under the SRI Policy.

## **JURY DEMAND**

SRI demands a trial by jury for all issues so triable.

WHEREFORE, SRI respectfully asks this Court for the following relief:

(a)   A judgment declaring that the SRI Excess D&O Liability Policy is rescinded and *void ab initio* as against WorldCom and all other insureds as that term is contemplated in the SRI Policy;

(b)   A judgment declaring that SRI has no obligation to defend or indemnify any person or entity in connection with any claim, lawsuit or other legal proceeding, including without limitation, the Securities Lawsuits;

(c)   A judgment awarding SRI the damages arising from WorldCom's fraudulent procurement of the SRI Policy;

(d)   A judgment awarding SRI its reasonable attorneys' fees and costs in this proceeding, and

(e)   Such other and further relief as to this court appears just and proper.

Date:   New York, New York
        July 21, 2004

Richard A. Kissel (RK-0072)
Charles Hyman (CH-8676)
Kissel & Pesce LLP
555 White Plains Road
5th Floor
Tarrytown, New York 10591
(914) 750-5933 (phone)
(914) 750-5922 (fax)

Attorneys for SR International
Business Insurance Company